In the Matter of the Guardianship of CHARLES FREDERICK EUGENE M., Also Known as CHARLES M., an Infant. CARDINAL MCCLOSKEY CHILDREN'S AND FAMILY SERVICES, Appellant; DIANE MARIE L., Also Known as DIANE M., Respondent.

First Department, November 26, 1991

APPEARANCES OF COUNSEL

*Gerald E. Bodell* of counsel *(Bodell & Gross,* attorneys), for appellant.

*Gail E. Allen* for respondent.

*Susan K. Knipps* of counsel *(Lenore Gittis, Law Guardian).*

## OPINION OF THE COURT

SULLIVAN J. P.

The infant, Charles M., was born on March 29, 1979, and was placed in petitioner agency's care on September 20, 1985, after respondent mother was incarcerated on charges that she sexually abused the child in a city-run shelter in which they were living. The original Family Court abuse petition alleged both the sexual abuse and the failure to exercise a minimum degree of care with respect to the child in that he had a cigarette burn on the arm. In November 1985 the Family Court found that respondent had committed an act of sexual abuse, as defined in Penal Law § 130.50, by performing oral sex upon him. Respondent was detained at Rikers Island on the criminal charges based on the incident from September 1985 to December 1986, when she was released pending trial. In July of 1987, respondent was convicted of sodomy in the first degree and endangering the welfare of a child and was sentenced to an indeterminate term of imprisonment of from two to six years on each count to run concurrently.

In November 1988, the agency filed a petition in Family Court seeking to terminate respondent's parental rights on the ground of permanent neglect. The petition alleged that the identity of the father was unknown. At the fact-finding hearing, an agency worker testified for the agency regarding arrangements it made for visitation between respondent and the child, contacts the agency maintained with respondent as well as with her counselor at State prison and the agency's efforts to assist respondent in planning for the child's future. Respondent offered a witness who testified as to the paucity of counseling services at the various facilities in which she was incarcerated.

After the evidence was heard, petitioner and respondent

stipulated that "the mother has maintained contact with the child and agency throughout the period of placement; that [they] have worked together to have visitation scheduled at regular intervals; that the mother has put forth, to the agency, during the course of the placement, all of the potential planning resources at her disposal, and that none of those turned out to be reasonable or viable—viable plans during the period of placement, and that were there a need for psychiatric intervention, and [the] court believes that based on the nature of the conviction alone, that there was a need for psychiatric intervention, that in all probability, necessary psychiatric intervention was not readily accessible to [the mother] during her period of incarceration."

Thereafter, in a written decision, the court dismissed the petition. The court held that while the resources put forth by respondent did not prove viable, her ultimate plan—the return of the child to her after release from incarceration—could not be said to be unrealistic or unreasonable. The court noted that her release was expected in the foreseeable future and that at that time she could be provided with appropriate services. The agency appeals.

Where parental rights are terminated on the ground of permanent neglect, there must be clear and convincing evidence that, notwithstanding the diligent efforts of the agency having custody of the child to encourage and strengthen the parental relationship, the parent has "failed for a period of more than one year following the date such child came into the care of [the] agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child". (Social Services Law § 384-b [7] [a]; *Matter of Gregory B.,* 74 NY2d 77, 86.) Since we believe that such a showing has been made in this case, we reverse.

"The threshold determination to be made in any neglect proceeding, of course, is whether the child care agency exercised diligent efforts to strengthen and nurture the parent-child relationship". *(Matter of Gregory B.,* at 86.) At the fact-finding hearing the agency presented evidence that throughout the period of placement, including the time of respondent's incarceration at Rikers Island, her temporary residency in Massachusetts pending her criminal trial and term of incarceration in State prison, it scheduled visitation at regular intervals and that it assisted respondent in planning for the child's future by contacting relatives suggested by her as possible resources. The agency also kept respondent apprised

of her son's health and progress by telephone. Further, the agency discussed counseling with respondent whenever it brought the child for visitation and, in a letter dated October 28, 1988, urged respondent to obtain counseling to prepare herself for the return of the child. Indeed, the agency specifically advised respondent that if she did not get psychological counseling, her parental rights might be terminated. We thus find that the requirement of due diligence has been satisfied.

Respondent nevertheless argues that petitioner failed to make the requisite "diligent efforts" since it did not assist her in obtaining psychological counseling to help her resolve or ameliorate the problem preventing the discharge of the child to her care. Insofar as incarcerated parents are concerned, however, a 1983 amendment to Social Services Law § 384-b eliminates the requirement that the agency provide such assistance to the parent. (L 1983, ch 911, § 2.)

Prior to the enactment of chapter 911, a finding of permanent neglect while the parent was incarcerated was precluded since such a parent was presumed unable to maintain contact with or plan for the future of his child. (Social Services Law § 384-b [7] [d] [ii]; *Matter of Gregory B.*, 74 NY2d, *supra,* at 88.) The child of an incarcerated parent could, however, be released for adoption since the consent of an incarcerated parent to adoption was not required. *(Matter of Gregory B., supra,* at 88; Domestic Relations Law § 111 [2] [former (d)].) "To correct this anomaly in the statutory scheme and to prevent the automatic termination of parental rights of incarcerated persons, the Legislature changed the law by removing the status of incarceration as a basis for the termination of parental rights and by recognizing the continuing parental obligations of incarcerated parents to their children". *(Matter of Gregory B., supra,* at 88.)

While chapter 911 imposed reciprocal obligations on the child care agency to work toward the reunification of the family, the amendment provided an explicit exception to the requirement that the agency help the parent to resolve or ameliorate the problems preventing the discharge of the child to the parent. In relieving the agency of this obligation with respect to incarcerated parents, the Legislature apparently recognized that there is very little the agency can do to provide this type of assistance to a parent who is incarcerated. Accordingly, to the extent that the agency was unable to provide all the assistance with respect to psychological counseling that it might otherwise have were it not for respon-

dent's incarceration, that factor would not preclude a determination that the agency made diligent efforts to strengthen the parent-child relationship. Indeed, as even respondent's counsel recognized, the "main issue" was respondent's "failure * * * to plan for a * * * realistic resource and [for] * * * appropriate psychological counseling."

The agency also established by clear and convincing evidence that respondent had failed for a period of more than one year to plan for the child's future. While the statute obligates the parent both to maintain contact with the child and realistically to plan for his or her future (Social Services Law § 384-b [7]; *Matter of Star Leslie W.,* 63 NY2d 136, 142-143), there is no question here of any parental failure to maintain contact. Rather, as noted, the focus is on respondent's failure to plan for the child. The statutory reforms do not excuse the incarcerated parent from the requirement that he or she plan for the future of the child; indeed, the amendments "explicitly recognize the planning responsibilities of incarcerated parents and state that the failure to meet those responsibilities may result, as with any other parent, in the termination of parental rights." *(Matter of Gregory B., supra,* at 89.)

Although respondent's initial plan was to have relatives care for the child, none of the relatives contacted by the agency was willing or able to assume responsibility for him. Respondent's planning responsibilities were not fulfilled by the providing of names of family members who turned out to be unable or ill-suited to care for the child. *(See, Matter of Miguel S.,* 140 AD2d 202, 205.) Good-faith efforts, even if present, are not sufficient; the plan must be realistic and feasible. (Social Services Law § 384-b [7] [c]; *see also, Matter of Gregory B., supra,* at 87.)

The agency worker testified that after it became clear that none of the relatives proposed by respondent was in a position to assume care of the child, respondent's new plan was to return to Massachusetts with the child after her release from prison and to make contact with the mental health facilities there. This alternative plan was no more than a dim hope; nothing concrete or specific had been formulated. *(See, Matter of Orlando F.,* 40 NY2d 103, 110.) In any event, a parent who intends to resume care for her child must "at a minimum * * * take steps to correct the condition[] that led to the removal of the child from [the] home". *(Matter of Leon RR,* 48 NY2d 117, 125.) There was no evidence that respondent had

taken any steps toward recognizing her problem and changing her pattern of behavior. *(See, Matter of Nathaniel T.,* 67 NY2d 838, 841-842.)* Specifically, there was no showing that during either the periods of incarceration or the seven months she was at liberty in Massachusetts pending trial on the criminal charges she attended any counseling program or even made any effort to seek counseling for her specific problem or in developing any parenting skills. It is relevant in this regard that, according to respondent's own witness, Rikers Island had psychiatric services available to inmates. Moreover, there was evidence that there were periods during her incarceration when respondent refused to conform to prison rules and thus was placed in "lock-up" and precluded from participating in prison programs. It is particularly noteworthy that respondent herself did not testify at the fact-finding hearing, although she was present throughout.

We thus conclude that on this record there is clear and convincing evidence that, despite the agency's diligent efforts to strengthen and encourage the parental relationship, respondent failed for well over one year to make any effort to take the steps necessary to provide her son with a stable and adequate home within a period of time that was reasonable.

Accordingly, the order of Family Court, New York County (Judith Sheindlin, J.), entered on or about May 18, 1989, which, after a fact-finding hearing, dismissed the petition seeking termination of the respondent mother's parental rights on the ground of permanent neglect, should be reversed, on the law and on the facts, without costs or disbursements, the petition granted and the matter remanded for a dispositional hearing.

MILONAS, KUPFERMAN, KASSAL and SMITH, JJ., concur.

Order, Family Court, New York County, entered on or about May 18, 1989, reversed, on the law and on the facts, without costs or disbursements, the petition granted and the matter remanded for a dispositional hearing.