Matter of T.W. (2003 NY Slip Op 51464(U))

[*1]

Matter of T.W.

2003 NY Slip Op 51527(U)

Decided on December 31, 2003

Family Court, Monroe County 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 31, 2003

Family Court, Monroe County 
In the Matter of the Commitment of Guardianship 
 and Custody pursuant to Social Services Law § 384-b of T.W., J. W. and K. W., 
 Children under the Age of Eighteen Years Alleged to be Permanently Neglected by MARIE W., RESPONDENT.
Docket No. B03526/28-03

Peter Essley, Esq., Deputy County Attorney, of counsel
Brian J. Wirley, Esq., Assistant Public Defender, for Respondent
Rehka Jain, Esq., Law Guardian

MARILYN L. O'CONNOR, J.
Monroe County Department of Human and Health Services (DHHS) filed a petition pursuant to Social Services Law, § 384-b, for termination of respondent's parental rights on March 20, 2003, alleging that respondent mother had permanently neglected her children, T. W. (DOB 1/15/91), J. W. (DOB 2/15/93) and K. W. (DOB 12/6/94). At the time of the filing, the father was deceased. Respondent mother had found being a single mother extremely difficult and the children had come into the care and custody of the DHHS on December 29, 2000, after she attempted suicide and was hospitalized (Petitioner's Exhibit 3). A two-day trial was held on the termination petition. For the reasons set forth below, the petition should be granted.
According to section 384-b(7)(a), 
. . . "permanently neglected child" shall mean a child who is in the care of an authorized agency and whose parent or custodian has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child. (Emphasis added.)
The allegations of the petition generally are (1) that the respondent failed to plan for the future of the children, as demonstrated by her failure to attend UCR meetings; (2) that she failed to get the necessary and appropriate mental health treatment; (3) that she failed to take parenting classes for months, and [*2]though she finally completed her attendance at a course in November of 2001, she still displayed parenting deficiencies; (4) that she repeatedly failed to visit the children; (5) that she had ongoing domestic violence problems and never did all the work necessary to resolve them; and (6) that she failed for many months to have stable housing and income for herself, let alone housing suitable for her children. The allegations are detailed and generally cover the period of December 2000 to March 2003, i.e., more than two years, with all areas allegedly being deficient for the one-and-one-half year period from April 2001 to September 2002.
DUE DILIGENCE
The threshold issue to be decided is whether the Department demonstrated due diligence in its efforts to strengthen respondent's parenting skills and reunite her with her children.
Much of the New York law applicable in a case such as this is aptly summarized in In re Star Leslie W. (63 NY2d 136, 142):
. . . . before terminating a parent's rights [because of permanent neglect] the State must first attempt to reunite the parent with her child. Thus, the threshold inquiry by the court in any neglect proceeding must be whether the agency exercised diligent efforts to strengthen the parental relationship (Matter of Sheila G., 61 NY2d 368). Those efforts must include counseling, making suitable arrangements for visitation, providing assistance to the parents to resolve or ameliorate the problems preventing discharge of the child to their care and advising the parent at appropriate intervals of the child's progress and development (Social Services Law, § 384-b, subd 7, par [f]; Matter of Sheila G., supra, at pp 384-386; Matter of Star A., 55 NY2d 560). These measures are not exclusive. The agency is free to attempt other reasonable and practical means to encourage and strengthen the family relationship.

Additionally, neglect may be found only after it is established that the parent has failed substantially and continuously or repeatedly to maintain contact with or plan for the future of the child although physically and financially able to do so (Social Services Law, § 384-b, subd 7, par [a]). The requirement is several: the parent must maintain contact with the child and also realistically plan for her future. A default in performing either may support a finding of permanent neglect (Matter of Orlando F., 40 NY2d 103, 110; Matter of Candie Lee W, 91 AD2d 1106; Matter of John AA., 89 AD2d 738). Insubstantial or infrequent contacts with the child are insufficient (Social Services Law, § 384-b, subd 7, par [b]) and the planning requirement contemplates that the parent shall take such steps as are necessary to provide a home that is adequate and stable, under the financial circumstances existing, within a reasonable period of time. Good faith alone is not enough: the plan must be realistic and feasible (Social Services Law, § 384-b, subd 7, par [c]).
The Legislature's guidelines on the exercise of due diligence (Matter of Sheila G., 61 NY2d 368, 384) say:
. . . 'diligent efforts' shall mean reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including but not limited to: (1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and his family; (2) making suitable arrangements for the parents to visit the child * * * (3) provision of [*3]services and other assistance to the parents * * * so that problems preventing the discharge of the child from care may be resolved or ameliorated; [and] (4) informing the parents at appropriate intervals of the child's progress, development and health (Social Services Law, § 384-b, subd 7, par [f]).

The evidence is clear and convincing that the due diligence burden was met (FCA § 622). The testimony of the caseworkers was credible and for the most part undisputed. Their testimony regarding the key due diligence issue is set forth below, and is corroborated by the documentary evidence, particularly regarding mental health therapy.
According to respondent's first case worker, Kim Terrigino, respondent was given many supervised visits, so that she could be with her children and learn how to parent them. Her attendance was poor and caseworker Terrigino personally discussed with respondent her poor attendance at scheduled visitation, she personally gave her bus passes and took her phone calls regarding bus passes which were claimed to be lost or stolen. It was agreed that the number of visitations would be increased after she made only 5 consecutive weekly visits. Respondent made the five visits and visitation was increased, though her attendance again was poor and no further increase in visitation thereafter was justified. In another demonstration of due diligence, Caseworker Terrigino also discussed respondent's mental health needs with her from the very beginning of her involvement with the case. Terrigino intervened with respondent's therapist, Fran McCarthy, who wanted to close the case because respondent was not attending treatment, and got her to schedule a conjoint to discuss resuming therapy. As a result, McCarthy kept respondent as a patient until she changed jobs. Respondent was offered dialectic behavior therapy (DBT) classes, and after she failed to attend those and was consequently not allowed to return to a first series of DBT classes, she was offered other DBT classes shortly thereafter. Terrigino went to respondent's place of residence to visit her and discussed medications with her, since her medications were allegedly making her sleepy. Terrigino also saw her at her Portland Avenue address. After respondent finished the domestic violence classes, Terrigino encouraged her to go to domestic violence support groups. Terrigino stated that she did not offer respondent a furniture voucher, but explained that respondent had furniture at her Avenue D address. She conceded there was no offer by her for DHHS to assist with the unpaid RG&E bill, but that bill did eventually get paid.
The second caseworker, Jessica Elam, also discussed mental health issues and visitation with respondent several times, and urged her to go to domestic violence groups several times. Elam even arranged for Saturday daytime domestic violence classes as respondent was afraid to go out at night. Elam visited respondent several times at her First Street address, and specifically discussed with her respondent's problem with her sister and with too many people living at the First Street address. At the Court's request, Elam moved visitation to respondent's home, but then back to Westfall at the respondent's request. Elam intervened on respondent's behalf with mental health providers, including Pruiett (who took over respondent's case in place of McCarthy), and personally supervised respondent's Friday and home visits, as well as some Wednesday visits. Elam discussed respondent' parenting shortcomings with her and recommended more parenting classes.
DHHS met the due diligence burden.
[*4]THE MERITS OF THE PETITION'S ALLEGATIONS OF PERMANENT NEGLECT
While the testimony did not establish each and every allegation of the petition, the evidence was overwhelming that the respondent had not substantially met the requirements of the disposition plan which went into effect February 12, 2001 and was extended through February 13, 2003, though she had made some progress. The clear and convincing evidence standard of proof for permanent neglect (Family Court Act, § 1046) was met, as discussed in detail below. 
A. Parenting, Domestic Violence, Housing, Planning
At the time of the filing respondent had completed parenting classes, but she was not yet a minimally responsible parent. She had not attended even one of the last three Uniform Case Reviews (UCRs). While she claimed to have gone to two UCRs over the relevant time period, the credible testimony was that she attended only 1 of 4, and probably confused one meeting she did attend with a UCR. She certainly failed to plan for the children. (Cf. Matter of Dianna UU, 224 AD2d 877; In re Latasha W., 268 AD2d 340).
By the time the petition was filed, she had belatedly taken many steps to eliminate a physically abusive boyfriend from her life. However, she had refused to participate in ongoing domestic violence support groups which were recommended for her by Alternatives for Battered Women and both caseworkers from the Department. In the relevant time period of the petition (January 2001 to April 2003), the respondent fled three times to ABW. (Cf. In re Ada M. R., 306 AD2d 920; In re Evin C., 232 Ad2d 767.)
 Moreover, respondent had a lengthy history of considerable housing instability, but was finally at the time of the hearing living in her own apartment and had the gas and electric back on. Still, she could not be said to have established reasonable permanent housing. In fact she admitted, "I'm not stable yet but I'm trying. I'm trying to get house stable. I think that's the only thing that's my problem is my house." (Oct. 9, 2003 Transcript, p. 27.) Housing, unfortunately, was not her only problem. (See Matter of Alicia Shanate H., 245 AD2d 509.)
B. Mental Health
Perhaps most important, respondent's significant mental health problems were not adequately addressed by her. She inexcusably missed many appointments with her mental health care providers, who diligently tried to help her, a patient with broad needs. Respondent has a history of numerous drug overdose attempts beginning at the age of 15, and including two hospitalizations for suicide attempts. After the suicide attempt which resulted in the removal of her children, she was diagnosed as severely depressed, an alcoholic with episodic alcohol abuse, with interpersonal difficulties (including fights with her mother and sister), self-mutilating behavior and an adjustment disorder with depressive mood. (Petitioner's Exhibit 3.) She also reported later to her therapist that she had been sexually abused as a child. She was an adult victim and perpetrator of physical abuse. She has undoubtedly needed significant mental health treatment throughout the relevant years and months, yet the record is clear that she made little effort to get the treatment needed, that her mental health providers tried very hard to get her engaged and attending appointments, that the caseworkers also tried to get her to attend her [*5]appointments, and that she often did not take her prescribed medications. Significantly, the services providers themselves, both McCarthy and Pruiett, concluded that she chose not to go to appointments, not that she could not get to them. The Court agrees with this assessment, and it is noteworthy that this important conclusion bolsters the Court's initial conclusion that the petitioner met the due diligence requirements of the law.
 Despite the convincing, and indeed overwhelming, evidence to the contrary, Respondent testified that she felt she had done a good job with respect to mental health treatment because she came a long way, but she knew that the Department caseworkers did not think she had done enough. (October 9, 2003, Transcript, p 26.) The large number of both one-on-one and group appointments missed for no good reason was unequivocally demonstrated by the Rochester Mental Health Center Records (Exhibit 3) and the Unity Health System records (Petitioner's Exhibit 5). The Court must conclude that she did not do enough and that her mental health providers were understandably very frustrated with her because of her missed appointments, despite their efforts to get her to cooperate with them.
Respondent missed her first appointment with her first Unity Health primary therapist, Fran McCarthy, scheduled for June 7, 2001, and respondent continued to miss more appointments than she attended. McCarthy tried hard. She would, for example, call her and write her to encourage her to come to appointments, but it did little, if any, good. The case notes in evidence show McCarthy was also routinely in contact with caseworkers about the problems. McCarthy noted that respondent missed one-third of her appointments prior to December 14, 2001. She soon negotiated with respondent that if she were 15 minutes late, there would be no appointment and if she missed three in a row, she would no longer receive therapy from her. A relevant note in the Unity records shows that McCarthy wrote on February 11, 2002, "Pt called 1 hr 45 min prior to appt to aske [sic] for a later appointment today. I told her I did not have one and she said she could make it to her 12 noon appt. today but she never showed up. Pt has hx [history] of this behavior". She further wrote regarding her plan, "Clinically I elect no followup [sic] as she know[s] how and when to get here. She chronically chooses not to come to appointments." (Exhibit 5, p 22.) With her May 2, 2002 "no show", McCarthy, wrote for her plan, "Clinically elect to have patient contact writer if she wants to continued [sic] tx [treatment]." (Exhibit 5, p 33.) On June 3, 2003 respondent failed to appear again, and McCarthy called her at home, found her home and engaged her in a discussion in which respondent inexplicably blamed the caseworker for respondent's missed appointment. (Exhibit 5, p 35.) McCarthy's June 20, 2003 notes point out that respondent was not on medication as she had not followed up with her doctor. (Exhibit 5, p38). McCarthy routinely kept the Department informed.
Respondent soon wanted a new therapist, but her CPS worker got her back to see McCarthy on July 29, 2003. At that point she had been off medication for several months, though she knew her caseworker wanted her to take medications. McCarthy deemed her "manipulative" in her notes for that day, writing that respondent finally had made an appointment to see a doctor since the case worker wanted her to do so. In August, 2002, McCarthy's notes again indicate she would not pursue the respondent, and that her chart would be closed if she did not appear by the end of the month for an appointment. (Exhibit 5, p 42.) The notes also reflect that respondent lied to McCarthy about attending two different DBT group meetings. Finally, McCarthy left the program, with respondent missing her [*6]last scheduled appointment with her. Jay Pruiett took over.
Pruiett had no more luck than McCarthy had had. Respondent came one-half hour late on December 20, 2002 for her first appointment with him. (Exhibit 5, p 52). Then she missed the next 7 appointments. He wrote in his notes on February 20, 2003, that he had telephoned her to get her to come to an appointment, and that she had missed her prior February 13, 2003 appointment. She finally appeared on February 27, 2003, and explained to Pruiett that she did not need therapy, because she did what "normal people do." Pruiett clearly disagreed with her personal assessment of no need. Respondent continued to miss appointments, so he decided on April 8, 2003 to close her case at the next opportunity. (Exhibit 5, p 58). She missed further appointments, for both individual and group treatment, and was not seen again at Unity Health until she came in for a mental health evaluation in August 2003. Then she again resumed her pattern of missed appointments. Based on this evidence no conclusion is possible other than that the respondent failed to take her mental health problems seriously, and though she was given ample support by the department and mental health providers, she did not get adequate treatment as needed. There was no need for the Department to take extraordinary efforts, such as picking respondent up and taking her to appointments.(Cf. Matter of April B., 242 AD2d 926; In re Latasha W., 268 AD2d 340.) These mental health treatment short-comings alone are a basis for a permanent neglect finding. (See In re Natnaniel T., 67 NY2d 838; In re Guardianship of Charles M., 171 AD2d 343; cf. Matter of Tiwana M., 267 AD2d 144).
C. Visitation
According to Pruiett's notes, "Pt said she does not attend her visits with her kids because there are times she just chooses not to. She said there are other times she is ill. She expresses belief it does not matter as she will lose custody anyway." (Exhibit 5, p 44). This substantiates a grave failure on respondent's part. The records show she did indeed often miss visitation and often came late. In one period she missed 21 of 95 visits. Then she made 5 visits in a row in order to get increased visitation, got that increase in visitation as a result, and proceeded to miss 4 out of 10 of the next visits. That she could do 5 visits in a row in order to get increased visitation shows clearly that she is capable of visiting regularly, and corroborates her treatment providers' conclusions and her own admission that she sometimes just chose not to. As pointed out by the petitioner's counsel, the children have remained in foster care for 34 months while their mother has not progressed beyond supervised visitation. Lack of progress toward being able to parent responsibly weighs in favor of a finding of permanent neglect and ultimately termination. (E.g., Matter of James H., 281 AD2d 920.) Respondent failed repeatedly to maintain contact with her children though physically and financially able to do so. Respondent's chosen behavior regarding visitation was permanent neglect. (See In re Latasha W., 268 AD2d 340; Matter of Alicia Shante H., 245 AD2d 509; Matter of Miracle Makers v Sonia J., 220 AD2d 593).
CONCLUSION
The respondent failed to address her mental health treatment needs and her domestic violence treatment needs. She was not housing stable. She did not visit her children as often as she could and should have. She did not demonstrate that the parenting classes she took made her a minimally responsible parent. She did not take advantage of the department's efforts to help her plan for the children's needs. This behavior all went on for more than one year. Thus, the Court concludes that the [*7]respondent has failed to do what she must to avoid a finding of permanent neglect, and the Department has done what was required of it. A finding of permanent neglect must be entered and a disposition hearing must be held.
NOW THEREFORE, it is
ADJUDGED, based upon clear and convincing evidence, that the Department made adequate diligent efforts to assist the respondent in meeting the terms of the relevant court order and controlling law; and it is further
ADJUDGED, based upon clear and convincing evidence, that the respondent's children were permanently neglected by respondent; and it is further
 ORDERED that the disposition hearing in this matter pursuant to Family Court Act § 631 will be held on ___________ at _____ AM/PM.
DATED: December 31, 2003
HON. MARILYN L. O'CONNOR,
FAMILY COURT JUDGE
NOTICE: Pursuant to section 1113 of the Family Court Act, an appeal must be taken within thirty days of receipt of the order by appellant in court, thirty-five days from the mailing of the order to the appellant by the clerk of the court, or thirty days after service by a party or law guardian upon the appellant, whichever is earliest.
MAILED OR HAND-DELIVERED: Peter Essley, Esq., Brian J. Wirley, Esq., Rehka Jain, Esq.
Decision Date: December 31, 2003